UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X
TROY MCKENZIE,

                    Petitioner,

                                          **MEMORANDUM & ORDER**

        -against-
                                          12-CV-3221 (KAM)

UNITED STATES OF AMERICA,

                    Respondent.
----------------------------------------X
**MATSUMOTO, United States District Judge:**

        On June 25, 2012, petitioner Troy McKenzie

("petitioner"), proceeding *pro se*, filed a petition pursuant to

28 U.S.C. § 2255 ("Section 2255") seeking to vacate, set aside,

or correct his sentence.  Petitioner was convicted by a jury on

April 18, 2008, and on August 13, 2009, the Honorable David G.

Trager sentenced petitioner to concurrent sentences of 120

months of custody on each count of conviction.  (Trial

Transcript ("Tr.") 374; 8/13/09 Safety Valve and Sentencing

Transcript ("Sent. Tr.") 44.)  On December 11, 2009, the

Honorable David G. Trager entered a judgment of conviction in

the United States Eastern District of New York.  Petitioner is

currently incarcerated at the Adams County Correctional

Institution in Natchez, Mississippi.

        Petitioner seeks to vacate his conviction and sentence

on two grounds.  First, petitioner alleges that his Sixth

Amendment rights were violated by the ineffective assistance of

his trial counsel, Barry Turner, Esq. ("Turner"), who petitioner claims did not permit him to testify at trial and failed to advise him to truthfully proffer and testify in connection with his safety valve hearing. Second, petitioner claims actual innocence based on what he claims is new, and allegedly exculpatory, evidence in the form of an affidavit written by federal inmate Marlon Campbell. For the reasons set forth below, the petition is denied.

**BACKGROUND**

## I. The Charges And Conviction

Petitioner Troy McKenzie was indicted in a superseding indictment on February 27, 2008. The superseding indictment charged him with the following: (1) Count One: conspiracy to possess with intent to distribute 1,000 kilograms or more of marijuana in violation of 21 U.S.C. §§ 846, 841(a)(1) and 841(b)(1)(A)(vii)[1]; (2) Count Two: conspiracy to commit money laundering in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i), (ii) and 1956(a)(1)(B)(i); (3) Count Three: attempted possession with intent to distribute five kilograms or more of cocaine in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A)(ii)(II); (4) Count Four: possession with intent to distribute 100 kilograms

---

[1] Although the superseding indictment charged conspiracy to possess with intent to distribute five kilograms or more of a substance containing cocaine in Count One, Judge Trager granted defendant's motion to dismiss the cocaine conspiracy prior to trial. (*United States v. McKenzie*, No. 04-CR-1110, ECF No. 50, Minute Entry dated 2/22/08; Tr. 4:10-12; Sent. Tr. 3:21-3:1.)

or more of marijuana in violation of 21 U.S.C. §§ 841(a)(1) and
841(b)(1)(B)(vii); and (5) Count Five: money laundering in
violation of 21 U.S.C. §§ 846 and 841(a)(1).

## II.  Petitioner's 2008 Trial and Sentencing

Petitioner was convicted after a five-day jury trial
in the Eastern District of New York of Counts One and Three,
respectively conspiracy to possess with intent to distribute
1,000 kilograms or more of marijuana in violation of 21 U.S.C.
§§ 846, 841(a)(1) and 841(b)(1)(A)(vii), and attempted
possession with intent to distribute five kilograms or more of
cocaine in violation of 21 U.S.C. §§ 846 and
841(b)(1)(A)(ii)(II).  *United States v. Troy McKenzie*, No. 04-
CR-1110 (DGT) (E.D.N.Y.).

### A.  The Government's Case

Petitioner's conviction stems from his participation
in a marijuana and cocaine distribution scheme.  At trial, the
government primarily relied on testimony by cooperating witness
and co-conspirator Robert McCleary ("McCleary"), a tractor-
trailer driver who transported drugs for petitioner and his co-
conspirators, and recorded telephone conversations between
cooperating witness McCleary and petitioner regarding the
transportation of narcotics.  The government's evidence also
included photographs, telephone records, and law enforcement
testimony.  McCleary testified about his role as a drug courier

for petitioner and co-conspirator Clacon James[2] ("James") and testified in detail about McCleary's transportation of large quantities of marijuana and cocaine between 2003 and 2004 on behalf of petitioner and co-conspirator James. McCleary testified that he understood James to be the "boss" of the operation, but considered James and petitioner to be "partners," and that James had instructed McCleary to contact petitioner in the event he could not reach James. (Tr. 160.)

McCleary testified that in or about early 2003, James paid McCleary $15,000 to transport marijuana from Texas to New Jersey. (Tr. 56-72.) McCleary understood that this shipment contained 1,000 pounds of marijuana, but was later told it was slightly less. (Tr. 71.) Two associates of James, nicknamed "6-0" and "Mr. Respect" paid McCleary $15,000 upon his delivery of the narcotics in New York. (Tr. 72.) McCleary further testified that he first met petitioner in 2003, after he was instructed by 6-0 to meet petitioner and other co-conspirators at an apartment in the Bronx, New York, to pick up money for the next shipment of marijuana. (Tr. 72-74.) When he arrived at the apartment, McCleary observed petitioner counting money contained in a garbage bag using a machine that petitioner had removed from another travel or "pull bag." (Tr. 74-75.)

---

[2] Clacon James was known to McCleary as "Mark" or "Marky," and is referred to as Mark or Marky in McCleary's trial testimony.

McCleary testified that after petitioner finished counting the money, he handed it to Mr. Respect, who passed the money to McCleary to drive back to Texas. (Tr. 75-76.) When McCleary arrived in Texas, he was instructed by James to give the money to James's associate, "Desi." (Tr. 78-79.)

Approximately three weeks later, Mr. Respect called McCleary and instructed him to go to Houston, Texas and call James for further instruction. (Tr. 79-80.) Once in Texas, McCleary called James, who instructed him to contact Desi. Desi then instructed McCleary to pick up a "load" in Houston, Texas containing electrical fixtures, such as wires, sockets, and other fixtures, as well as a load of marijuana from a ranch in Seguin, Texas. (Tr. 80-82.) He testified that "the same person that called [him] before on the first trip" instructed him to deliver this marijuana shipment to a warehouse in New Jersey that was "the same place that we go before [*sic*]." (Tr. 83.) At the warehouse, after McCleary and others unloaded the marijuana from the truck, McCleary received a call from James, 6-0, and Desi informing him that part of the load was believed to be missing. (Tr. 84-85.) McCleary testified that after the delivery, he met 6-0, who brought him to the apartment in the Bronx where Mr. Respect was waiting. (Tr. 86.) The three men went to a restaurant to meet James; however, when they arrived, petitioner was waiting without James. (Tr. 86-87.) At this

time, petitioner instructed Mr. Respect to inform McCleary that James had to make a decision about the missing marijuana. (Tr. 86.) McCleary drove home to Miami, Florida after the encounter and began driving legitimate loads because James and petitioner did not want him to transport marijuana after the incident with the missing drugs. (Tr. 87-90.)

McCleary testified that in October 2003 he was again called by James who told him that none of the marijuana had been missing and there had been a mistake. (Tr. 94-95.) James asked McCleary to start transporting drugs again for him, and in June 2004, McCleary drove eight duffel bags filled with 400 pounds of marijuana from Florida to New York. (Tr. 94-100.) While on the New Jersey Turnpike, McCleary called James, who informed him that his "brother," who McCleary understood to be petitioner, would call McCleary with directions to a location in Ridgewood, New York. (Tr. 98.) McCleary testified that petitioner then called him and provided directions to a construction yard, where petitioner met him with another man and unloaded the marijuana from the truck into an Altima, in which petitioner then drove off. (Tr. 99-100.) For this trip, James paid McCleary $17,000. (Tr. 100.) In September 2004, McCleary transported approximately 150 pounds of marijuana from New Mexico to the Bronx. (Tr. 102-109.) James met McCleary in the Bronx to pick

up the marijuana, and two days later paid McCleary $7,500. (Tr. 106-07.)

In October 2004, McCleary began transporting cocaine, and couriered approximately five boxes of cocaine from Seguin, Texas to Atlanta, Georgia. (Tr. 108-13.) After delivering the shipment in Atlanta, where he met Desi, McCleary was handed a "small . . . bag with a small quantity" of cocaine; James had previously told McCleary that Desi was going to give him the small package of cocaine to bring to James in the Bronx. (Tr. 111-12.) McClearly couriered this remaining quantity from Atlanta to the Bronx, where he met and delivered the drugs to James. (Tr. 111-12.) James paid McCleary $15,000 of the $50,000 he was due for the transportation. (Tr. 113.) According to McCleary, three days later — after the cocaine was sold — he called petitioner, who told him that James gave petitioner the money to pay McCleary for the cocaine. Petitioner then met McCleary in the Bronx and paid McCleary the remaining balance of $35,000. (Tr. 113-14.)

In early November 2004, McCleary transported four duffel bags of cocaine from Texas to Georgia for James, for which he received $50,000. (Tr. 124-30.) Following this trip, James instructed McCleary to transport four duffel bags containing approximately 100.1 kilograms of 85% pure cocaine from Texas to New York. (Tr. 138-42; Ex. B (GX 4 (DEA

7

Laboratory Report dated Dec. 22, 2004)); Ex. C (GX 5
(Stipulation dated Apr. 11, 2008))).  On the morning of November
27, 2004, while en route to New York, McCleary was pulled over
by a Louisiana state trooper on a Louisiana highway.  After the
trooper checked McCleary's tags, license, and registration, the
trooper told McCleary that he was the subject of an outstanding
warrant from South Carolina on a gun possession charge.  (Tr.
142-43)  During the stop, McCleary consented to a search and the
state trooper discovered the cocaine shipment and placed
McCleary under arrest.  (Tr. 26-28, 143-45.)  After his arrest,
McCleary was brought to the "narcotics headquarters" where he
agreed to cooperate with law enforcement by participating in a
controlled delivery using sham cocaine and engaged in
consensually-monitored and recorded telephone calls with James
and petitioner regarding the delivery of narcotics in New York.
(Tr. 144-47.)

On November 29, 2004, McCleary arrived in Queens and,
in a recorded telephone conversation, received directions from
petitioner who alluded to McCleary's previous marijuana delivery
in June 2004 by stating that McCleary should "remember [his]
way" and by asking "[d]on't you remember[,] driver?".  (Tr. 151-
152; Ex. D (GX 1a (Transcript of Consensual Recording dated Nov.
29, 2004)) at 4, 5.)  Petitioner also stated, "[b]ut you find it
easy the other day," and offered to meet McCleary to assist him

in finding the lot. (Tr. 155, Ex. F (GX 1c (Transcript of Consensual Recording dated Nov. 29, 2004)).) After McCleary arrived at the gate in front of the construction lot in Ridgewood, New York, petitioner and others were arrested. (Tr. 156-57, 235.) At the time of petitioner's arrest, his phone was ringing from a call from James. (Tr. 234-37.) Shortly after petitioner's arrest, James arrived at the lot and was also arrested. (Tr. 235-36.)

### B. The Defense's Case

At trial, the defense called two character witnesses. The first, an acquaintance of petitioner, testified that petitioner lived in a rough neighborhood, that he had never seen petitioner involved in drugs, and that petitioner did not have a gray Altima. (Tr. 280-82.) The second, a former employer, testified that he had never seen petitioner in the presence of drugs. (Tr. 287-88.)

### C. Conviction

After both parties rested, petitioner renewed his motion pursuant to Federal Rule of Criminal Procedure Rule 29 for acquittal, alleging insufficient evidence, and his motion was denied by the district court. (Tr. 297-98.) On April 18, 2008, the jury returned a guilty verdict against petitioner on Count One (conspiracy to possess with intent to distribute 100 grams or more of a substance containing marijuana between

December 1, 2000 and November 29, 2004) and Count Three
(attempted possession with intent to distribute five kilograms
or more of cocaine between November 26, 2004 and November 29,
2004). *McKenzie*, 04-CR-1110 (DGT) (E.D.N.Y.). The jury
acquitted petitioner of Counts Two, Four, and Five, which
charged defendant with conspiring to commit and committing money
laundering (Counts Two and Five) as well as possession with
intent to distribute 100 kilograms or more of marijuana (Count
Four). *Id.*

    At the close of trial, the court stated to
petitioner's trial counsel, Mr. Turner: "Mr. Turner, you did a
very nice job. You weren't successful but it was a close case
and you really – I've listened to a lot of defense lawyers. He
has no complaint about the quality of work you did. Okay? I
think it's reflected in the jury's verdict." (Tr. 435.)

    On May 13, 2009, petitioner participated in a proffer
session with the government. (*See* Govt. Opp. Ex. G, Notice of
Factual Disputes With the Pre-Sentence Investigation Report
("PSI. Disp.") at 20; Ex. H, Govt.'s Sentencing Letter dated
7/20/09 ("Govt.'s 7/20/09 Ltr.) at 5.) Petitioner maintained
his innocence with respect to the cocaine conspiracy charged in
Count Three. (*See* PSI. Disp. at 1.) He admitted that he knew
James "was involved in the marijuana business" and that he and
James maintained a close relationship, but that he had no part

in James's business.  (PSI. Disp. at 20-21; Govt.'s 7/20/09 Ltr. at 5.)   Petitioner admitted that he directed McCleary to the lot where petitioner was arrested on November 29, 2004 and that he knew McCleary was delivering marijuana.  (*See* Not. Disp. 20-21.)  Petitioner also admitted that he had previously directed McCleary to this lot for the purposes of delivering marijuana. (PSI Disp. at 21.)  Petitioner stated that he gave the directions to McCleary as a favor to James, and on occasion met McCleary at the lot, but denied ever removing drug shipments from the truck or having any other dealings with McCleary. (Govt.'s 7/20/09 Ltr. at 5.)

     **D.   Sentencing**

     On August 13, 2009, petitioner appeared before the Honorable David G. Trager for a safety valve and sentencing hearing with regard to petitioner's motion for safety-valve relief and for sentencing.  At the safety-valve hearing, petitioner testified that he knew James was involved in selling marijuana and that, at the request of James, petitioner had given McCleary directions to a drop-off point on two occasions, including on the day of his arrest.  (Sent. Tr. 9-10.) Petitioner also testified that he knew McCleary's truck contained marijuana on the day of his arrest.  (Sent. Tr. 10.) Petitioner, however, denied meeting McCleary in the Bronx and denied giving McCleary a suitcase full of money.  (*Id.*)

Petitioner also denied any participation in marijuana and cocaine trafficking, alleging that he had been set up by James and that he had never coordinated marijuana or cocaine transactions with truck drivers. (Sent. Tr. 18, 27.)

On cross-examination at the hearing, petitioner was shown a report of a debriefing of another truck driver who stated that he had worked for petitioner and James. (Sent. Tr. 28; Gov't Ex. I.) He was also shown a report from an interview with a cooperating witness, who proffered that he had met with petitioner and James in 2002, and that they had agreed to send him $180,000 as a prepayment for a bulk shipment of marijuana. (Sent. Tr. 29-30.) The cooperating witness also reported that he had been kidnapped by narcotics traffickers in Mexico because he could not pay for cocaine that he had purchased for James, and that he had contacted petitioner after he failed to get in contact with James. (Sent. Tr. 31.) The same individual also reported that petitioner had paid him a sum of money at a New York hotel for a shipment of cocaine in 2004. (Tr. 33.) Petitioner denied that any of these incidents occurred. (Sent Tr. 28-33.)

Petitioner also testified on cross-examination about a previous arrest at the U.S.-Mexico border in or around 2000, for which he was ultimately released without charges. (Sent. Tr. 13-14.) Petitioner was cross-examined about his employment

record, his previous claims in bankruptcy court and to social security that he lacked income, and the four properties he owned in the Bronx, Queens and Brooklyn, including one property, valued between $135,000 and $185,000, that petitioner testified had been deeded to him out of friendship. (Sent. Tr. 21-25.) Additionally, petitioner was asked about the reason his application for U.S. citizenship was denied, and petitioner testified that it was due to an inability to submit paperwork timely, rather than a finding by an administrative officer that he provided false testimony. (Sent. Tr. 33-34.)

At the end of petitioner's cross-examination, the court asked the petitioner whether he understood that "it [did]n't matter what [he] admit[s] to, as long as [he tells] the truth." (Sent. Tr. 35.) Petitioner responded, "The truth, yes, sir." (Sent. Tr. 35.) Petitioner then testified that James had set people up and that they were attempting to retaliate against him and James by implicating petitioner in crimes he did not commit. (Sent. Tr. 35-36.) Petitioner further testified and his counsel further clarified that a prisoner at the Metropolitan Detention Center (MDC) in Brooklyn had informed petitioner that McCleary told the prisoner that McCleary had provided false testimony against petitioner to save himself (McCleary) and retaliate against James and petitioner for cooperating with the government. Petitioner's counsel also

argued that the other cooperators gave statements (Gov. Exs. 1-3) implicating petitioner because they erroneously assumed petitioner and James were working together because James introduced petitioner as his brother, but that petitioner was not involved in drug trafficking with James.  (Sent. Tr. 36-37.) The government then responded to petitioner's theory of retaliation by McCleary and others because of the purported cooperation and "set-ups" by James.  The government informed the court that McCleary had begun cooperating with the government immediately after his arrest in Louisiana, and that McCleary's cooperation led to the arrests of James and petitioner.  (Sent. Tr. 38.)

At the close of the safety-valve hearing, the court determined that petitioner had not been "completely candid with the government" and found petitioner ineligible for a safety valve reduction pursuant to 18 U.S.C. § 3553(f).  (Sent. Tr. 39.)  Judge Trager then sentenced petitioner to 120 months' imprisonment on each count of conviction to run concurrently, five years supervised release, and a special assessment of $200. (Sent. Tr. 44.)

## III. Direct Appeal

On December 16, 2009, petitioner appealed his conviction and sentence to the Second Circuit, alleging that there was insufficient evidence to support his conviction and

challenging the sentencing court's finding that petitioner was
ineligible for safety valve relief, pursuant to 18 U.S.C.
§ 3553(f). (*United States v. Troy McKenzie*, No. 09-CR-5179,
Dkt. No. 1.) Petitioner argued, with respect to Count One, that
evidence establishing that petitioner gave money to Mr. Respect,
that this money was later transported to Texas, and that
petitioner was present during a conversation between Mr. Respect
and 6-0 about missing marijuana did not prove beyond a
reasonable doubt that he had participated in the conspiracy.
*United States v. McKenzie*, 421 F. App'x 28, 30 (2d Cir. 2011).
With respect to Count Three, petitioner argued that the evidence
did not prove beyond a reasonable doubt that he was aware that
McCleary's November 29, 2004 shipment contained cocaine, or that
he attempted to actually possess the cocaine. *Id.* at 31.
Moreover, petitioner argued that his role was limited to
providing McCleary with driving directions to the construction
yard. *Id.* at 31-32.

On April 29, 2011, in a summary order, the Second
Circuit affirmed petitioner's conviction and sentence, and the
district court's denial of safety valve relief. *Id.* at 32-33.
Specifically, the court found that there was sufficient evidence
in the trial record to support petitioner's conviction on both
counts. With respect to Count One, the Second Circuit noted
that the totality of McCleary's testimony constituted "ample

evidence upon which the jury could reasonably conclude that
[petitioner] was aware of the conspiracy to distribute
marijuana, and that he knowingly joined and participated in that
conspiracy." *Id.* at 31. With regard to Count Three, attempted
possession with intent to distribute five kilograms or more of
cocaine, the Second Circuit found that there was sufficient
evidence from which a reasonable jury could infer that
petitioner was guilty of an attempt to possess the cocaine
shipment being transported on November 29, 2004. *Id.* Even
though petitioner contended that he lacked actual knowledge of
the type or quantity of drugs involved, the Second Circuit
determined that the jury could have found that petitioner had
the intent to commit the offense by directing McCleary's truck
containing cocaine to the delivery yard, and meeting him there,
and that petitioner thus engaged in conduct amounting to a
substantial step toward commission of the crime. *Id.* at 32. In
any event, petitioner's actual knowledge of the drug type and
quantity is irrelevant under the offense charged in Count Three.
*Id.* Further, the Second Circuit held that the district court
did not err in determining that petitioner was not entitled to
safety valve relief because "[petitioner] failed to address a
number of incriminating facts during his proffer session and the
subsequent hearing, and his explanations for certain

discrepancies between his testimony and the record evidence were not entirely plausible." *Id.* at 33.

## IV.  The Instant Petition

On June 25, 2012, petitioner filed the instant petition pursuant to 28 U.S.C. § 2255.  The petition was filed within one year of the date on which judgment of his conviction became final and, therefore, the petition is timely.  *See* 28 U.S.C. § 2255(f)(1).

## STANDARD OF REVIEW

A prisoner in federal custody may challenge the validity of his sentence by petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence on the basis "that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack."  28 U.S.C. § 2255(a); *Reisman v. United States*, No. 12-CV-291, 2013 WL 5774592, at *3 (E.D.N.Y. Oct. 24, 2013) (citing *Adams v. United States*, 372 F.3d 132 (2d Cir. 2004)).  Collateral relief from a final judgment is available only "for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes 'a fundamental defect which inherently results in a miscarriage of justice.'"  *United States v. Bokun*,

73 F.3d 8, 12 (2d Cir. 1995) (quoting *Hill v. United States*, 368 U.S. 424, 428 (1962)).

Section 2255 petitions must be filed in the district court "which imposed the sentence" being challenged.  28 U.S.C. § 2255(a).  Additionally, prisoners may not use Section 2255 as a substitute for a direct appeal.  *Marone v. United States,* 10 F.3d 65, 67 (2d Cir. 1993) (citing *United States v. Frady,* 456 U.S. 152, 165 (1982)).  Generally, with the exception of ineffective assistance claims, "a claim may not be presented in a habeas petition where the petitioner failed to properly raise the claim on direct review."  *Zhang v. United States*, 506 F.3d 162, 166 (2d Cir. 2007) (citation omitted).  "Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either 'cause' and actual 'prejudice,' or that he is 'actually innocent."  *Bousley v. United States*, 523 U.S. 614, 622 (1998) (citations omitted).

Further, it is well established that Section 2255 may not be used to litigate issues that have been decided adversely to a defendant on direct appeal.  *United States v. Sanin*, 252 F.3d 79, 83 (2d Cir. 2001); *see Reese v. United States*, 329 F. App'x 324, 326 (2d Cir. 2009); *United States v. Natelli,* 553 F.2d 5, 7 (2d Cir. 1977) (per curiam) ("[O]nce a matter has been decided adversely to a defendant on direct appeal it cannot be

relitigated in a collateral attack under section 2255."). "[A] petitioner may bring an ineffective assistance of counsel claim [in a petition pursuant to Section 2255] whether or not the petitioner could have raised the claim on direct appeal." *Mui v. United States*, 614 F.3d 50, 54 (2d Cir. 2010) (citing *Massaro v. United States*, 538 U.S. 500, 509 (2003)).

In reviewing the instant petition, the court is mindful that "[a] document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (internal quotation marks and citations omitted); *Williams v. Kullman*, 722 F.2d 1048, 1050 (2d Cir. 1983) (noting that courts should review *pro se* habeas petitions with a lenient eye). Accordingly, the court is obliged to interpret petitioner's pleadings as raising the strongest arguments they suggest. *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009); *Martin*, 834 F. Supp. 2d at 119 (citing *Williams*, 722 F.2d at 1050).[3]

---

[3] The government's opposition to the petition requests dismissal pursuant to Rule 4(b) of the Rules Governing Section 2255 Proceedings, which requires courts to review and deny Section 2255 petitions before directing an answer "[i]f it plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief." Rules Governing Section 2255 Proceedings for the United States District Courts, Rule 4(b); *see Acosta v. Artuz*, 221 F.3d 117, 123 (2d Cir. 2000). The court declines to summarily dismiss the petition under Rule 4(b) because it does not "plainly appear" from the petition and any attached exhibits that the petitioner is not entitled to relief in the district court. Further, this court directed the respondent to show cause on June 29, 2012 (ECF No. 3.), thus rendering this point moot. Although the court denies respondent's

**DISCUSSION**

In this proceeding, jurisdiction is proper and petitioner has timely filed his petition for a writ of habeas corpus.[4] (Pet. at 1). Petitioner asserts the following as grounds for habeas relief: (1) ineffective assistance of counsel based on (a) trial counsel's "failure to permit" petitioner to testify at trial and (b) trial counsel's failure to advise petitioner to be truthful at his safety valve hearing, and (2) actual innocence, supported by new evidence.

## I. Ineffective Assistance of Counsel

### A. Legal Standard

The Sixth Amendment protects the right of a criminal defendant "to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. This requires that a defendant receive "effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 (1970). In considering ineffective assistance of

_____

request for dismissal on Rule 4(b) grounds, the court nevertheless dismisses the petition on the merits.

[4] Section 2255 petitions must be brought within one year "of the date on which the judgment of conviction becomes final." 28 U.S.C. § 2255(f)(1). When a federal criminal defendant makes a direct appeal, the judgment of conviction becomes final for Section 2255 purposes "when the time for filing a certiorari petition expires" or, if the defendant filed a timely petition for certiorari, when the Supreme Court "affirms a conviction on the merits on direct review or denies a petition for a writ of certiorari." *Clay v. United States*, 537 U.S. 522, 527 (2003). A petition for certiorari "is timely when it is filed . . . within 90 days after entry of the judgment." Sup. Ct. R. 13.1. Accordingly petitioner's Section 2255 petition was timely filed because it was filed on June 25, 2012, which is within one year and 90 days of April 29, 2011, when the Second Circuit entered judgment affirming his conviction. *See McKenzie*, 421 F. App'x at 28.

counsel claims, the Second Circuit has held that a defendant "need establish only that he has a 'plausible' claim of ineffective assistance of counsel, not that 'he will necessarily succeed on the claim.'" *Puglisi v. United States,* 586 F.3d 209, 213 (2d Cir. 2009) (quoting *Armienti v. United States,* 234 F.3d 820, 823 (2d Cir. 2000)).

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court articulated a two-prong test to determine whether an attorney has provided effective assistance of counsel. The *Strickland* test contemplates whether the petitioner received "reasonable effective assistance of counsel, such that counsel's actions neither: (1) fell below an objective standard of reasonableness (the "performance prong"); or (2) caused a reasonable probability that the result of the trial would have been different but for counsel's unprofessional conduct (the "prejudice prong"). *Id* at 687-96. The *Strickland* standard is both "highly demanding," and "rigorous." *Kimmelman v. Morrison,* 477 U.S. 365, 382 (1986); *Lindstadt v. Keane,* 239 F.3d 191, 199 (2d Cir. 2001). The petitioner bears the burden of proving that both *Strickland* prongs are met. *Byrd v. Evans,* 420 F. App'x 28, 30 (2d Cir. 2011) (citing *Kimmelman,* 477 U.S. at 381). In considering the performance prong, a court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466

U.S. at 689.  Petitioners are tasked with overcoming "the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"  *Id.* (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

Under the prejudice prong, courts consider "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."  *Id.* at 686.  To establish prejudice, a petitioner must demonstrate that "there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."  *Henry v. Poole*, 409 F.3d 48, 63-64 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 695).  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Strickland*, 466 U.S. at 694.  Where, as here, a petitioner challenges his sentence, "the petitioner must show that but for counsel's ineffectiveness, there is a reasonable probability that the sentence imposed would have been different."  *Martin*, 834 F. Supp. 2d at 126 (citing *United States v. Workman*, 110 F.3d 915, 920 (2d Cir. 1997)).

When faced with an ineffective assistance of counsel claim, the court must treat the allegation seriously and determine whether a hearing is warranted.  Under Section 2255, "[u]nless the motion and the files and records of the case

conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the United States attorney, grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto." *Chang v. United States*, 250 F.3d 79, 84 (2d Cir. 2001) (citing 28 U.S.C. § 2255). A court need not hold a full evidentiary hearing if the defendant's assertion is unsupported by the trial record and, as is the case here, flatly contradicted by a detailed affidavit from his trial lawyer. *Id.* at 86. Where there is sufficient evidence, the court is not required to engage in "the delay, the needless expenditure of judicial resources" and the other burdens of a fruitless hearing. *Id.*; *Lang v. United States*, No. 02-CR-1444, 2009 WL 4788430, at *2 (S.D.N.Y. Dec. 9, 2009).

### 1. Failure to Inform Petitioner of the Right to Testify

The right to testify at one's criminal trial "has sources in several provisions of the Constitution, including the Due Process Clause of the Fifth and Fourteenth Amendments, and the Compulsory Process Clause of the Sixth Amendment." *Rock v. Arkansas*, 483 U.S. 44, 51-52 (1987); *see also Brown v. Artuz*, 124 F.3d 73, 78 (2d Cir. 1997), *cert. denied*, 522 U.S. 1128 (1998). Additionally, the Supreme Court has held that the "opportunity to testify is also a necessary corollary to the

Fifth Amendment's guarantee against compelled testimony." *Rock*, 483 U.S. at 52.

The right to testify is personal to a defendant and can only be waived by the defendant. *Brown*, 124 F.3d at 76. Thus, defense counsel should provide a defendant with advice about the benefits and hazards of testifying, and may "strongly advise the course that counsel thinks best," but "must inform the defendant that the ultimate decision whether to take the stand belongs to the defendant, and counsel must abide by the defendant's decision on this matter." *Id.* at 79. To provide effective assistance of counsel, defense counsel must ensure that the defendant is informed of the nature and existence of the right to testify. *Id.*

Failure to inform a defendant of his right to testify constitutes ineffective assistance of counsel. *Id.* at 79. A petitioner who claims that his counsel failed to inform him of his right to testify therefore must establish his claim under the *Strickland* test set out above. *See id.* at 80. Additionally, "as any non-testifying defendant can claim that he was denied his right to testify after the trial, a defendant bears the burden of proving his claim with detailed allegations." *Contreras v. U.S.*, No. 08-CV-1976, 2009 WL 1174730, at *4 (S.D.N.Y. Apr. 30, 2009) (citing *Chang v. United States*, 250 F.3d 79, 84-86 (2d Cir. 2001)), *adopted by Contreras*

*v. U.S.*, No. 08-CV-1976 (S.D.N.Y. May 15, 2009), ECF No. 14.

Moreover, a petitioner who has been denied the right to testify

must still establish that his failure to testify prejudiced his

case. *See Rega v. United States*, 263 F.3d 18, 22 (2d Cir. 2001)

(finding that counsel's failure to properly advise defendant of

his right to testify did not prejudice defendant where court

found that defendant's testimony would have done more harm than

good).

Petitioner claims that "due to counsel's failure to

permit the petitioner to testify" at trial, he was unable to

challenge the credibility of the government's witness McCleary

and the other evidence presented by the government. (Pet. at

5.) The trial record, however, reflects that counsel did

inform petitioner of his right to testify. After the court

asked petitioner's counsel if he was going to testify, defense

counsel responded, "No." The following exchange then occurred:

> The Court: You informed [your client] that the fact
> [*sic*] he shouldn't have to listen to you but that the
> ultimate decision is his.
>
> Mr. Turner: Yes. You know that, right, that the
> ultimate decision is yours, not mine on whether or not
> you testify?
>
> Defendant: Yes.

(Tr. 278-279.) Moreover, upon the filing of petitioner's writ

of habeas corpus, the court ordered petitioner's trial counsel,

Barry Turner, to submit an affidavit responding to petitioner's

allegations of ineffective assistance. Turner stated in a sworn affidavit (Affidavit of Barry Turner ("Turner Aff.")) that "at the end of the Government's case on trial, [he] advised [his] client that he had an absolute right to testify on his own behalf" but that he advised petitioner that "based on the government's case and his past history, it would be a risk to testify." (Turner Aff. 1.) Turner's affidavit further corroborates the trial record that petitioner was not denied effective assistance of counsel because his attorney did, in fact, inform him of his right to testify at trial. *See U.S. v. Ozsusamlar*, No. 05-CR-1077, 2007 WL 2826601, at *14 (S.D.N.Y. Sept. 20, 2007) (finding petitioner's ineffective assistance of counsel claim not credible where his attorney testified that he had discussed petitioner's right to testify but advised against it because of his prior history).

Under similar circumstances, in *Contreras*, a magistrate judge, in a report and recommendation subsequently adopted by the district court, determined that a petitioner claiming ineffective assistance of counsel was unable to provide specific evidence that he was denied his right to testify where the petitioner's trial attorneys affirmed that they had informed him of his right to testify and "their accounts [were] corroborated by the trial record." 2009 WL 1174730, at *4. Because the allegations of the petitioner in *Contreras* "provided

nothing more than 'his own highly self-serving and improbable assertions' to support his claim," the court found that the petitioner's ineffective assistance of counsel claim failed. *Id.* (citing *Chang*, 250 F.3d at 86).

Here, petitioner has provided no evidence, other than his own conclusory and self-serving statement, to establish that his right to testify was denied, and courts have recognized that self-serving affidavits alleging such failures are insufficient to establish that counsel was ineffective based on an asserted failure to advise of the right to testify. *Brown*, 124 F.3d at 80-81; *United States v. Castillo,* 14 F.3d 802, 805 (2d Cir. 1994) (defendant failed to establish involuntary waiver of right to testify with affidavit alleging he was unaware of right), *cert. denied,* 513 U.S. 829 (1994); *Dominguez-Gabriel v. United States*, No. 09-CR-157, 2014 WL 4159981, at *6 (S.D.N.Y. Aug. 21, 2014). The petitioner's bare assertion that counsel "fail[ed] to permit the Petitioner to testify," balanced against the evidence from the trial record and in Mr. Turner's affidavit, is insufficient to warrant a hearing or habeas relief on grounds of ineffective assistance. Accordingly, petitioner has not satisfied the "performance prong" of his ineffective assistance of counsel claim.

Further, even assuming, *arguendo*, that petitioner were able to satisfy the performance prong of the *Strickland* test,

petitioner is unable to show that his counsel's alleged
deficiency resulted in prejudice. When petitioner testified at
his safety valve hearing, the court found that his testimony
regarding the incidents about which McCleary testified were not
"completely candid," and deemed him ineligible for safety valve
relief. (Sent Tr. 278.) Upon review of the record, the Second
Circuit similarly found that petitioner "failed to address a
number of incriminating facts during his proffer session and the
subsequent hearing, and his explanations for certain
discrepancies between his testimony and the record evidence were
not entirely plausible." *McKenzie*, 421 F. App'x at 33. The
petitioner does not explain why a jury, unlike the district and
circuit courts, would have found his testimony credible in light
of contradictory testimony and other trial evidence.

Furthermore, any effect of petitioner's testimony on
the jurors would have depended on their assessment of the
credibility of petitioner and the cooperating witnesses who
testified against him, as well as other trial evidence. In
*Rega*, the Second Circuit denied an ineffective assistance claim
based on trial counsel's alleged failure to advise defendant of
his right to testify because the effect of the petitioner's
testimony was "wholly dependent on either his credibility or on
the incredibility of the witnesses against him." *Rega*, 263 F.3d
at 22; *United States v. Fleurimont*, 401 F. App'x 580, 584 (2d

Cir. 2010) (quoting *Strickland*, 466 U.S. at 697) (rejecting petitioner's claim that his trial counsel had refused to permit him to testify where petitioner could not establish reasonable probability of prejudice). The court noted that "[a]ny probability of an acquittal . . . must be based on an assessment that, if [defendant] had testified, the jury would have credited his testimony, notwithstanding the substantial evidence against him." *Rega*, 263 F.3d at 22. The court concluded that the government had presented ample evidence of defendant's involvement in the charged offenses, and that if defendant had taken the stand, "the probability of a conviction would have increased because his testimony would have been severely undermined by impeachment evidence." *Rega*, 263 F.3d at 22.

Similarly, here, the government presented ample evidence of petitioner's guilt at trial, including recorded telephone conversations between petitioner and a cooperating witness and the testimony of law enforcement and cooperating witnesses regarding petitioner's knowledge of and involvement in the charged offenses.[5] (*See* Sent. Tr. 28-33.) Accordingly, petitioner is unable to establish that, had he testified, the "factfinder would have had a reasonable doubt respecting guilt."

---

[5] Notably, petitioner asserts that his defense was "put forth in his safety valve proffer," but the sentencing court ultimately found that petitioner was not "completely candid" and therefore did not qualify for safety valve relief. (Sent. Tr. 35.)

*Strickland*, 466 U.S. at 695; *see also Halo v. U.S.*, No. 06-CV-5041, 2007 WL 1299158, at *3 (E.D.N.Y. Apr. 30, 2007) (finding petitioner's failure to testify did not result in prejudice where three witnesses testified against petitioner); *see also Ozsusamlar v. United States*, No. 05-CR-1077, 2012 WL 4473286, at *2, 5 (S.D.N.Y. Sept. 28, 2012) (finding petitioner's failure to testify did not result in prejudice where the government had evidence from a cooperating witness and recorded telephone conversations). In light of petitioner's failure to satisfy the two-prong test established in *Strickland*, the court denies and dismisses his ineffective assistance of counsel claim with respect to counsel's alleged failure to advise him of his right to testify.

### 2. Counsel's Advice Regarding Safety Valve Proffer

Courts similarly apply the *Strickland* test to a petitioner's claims that his counsel provided ineffective assistance at the sentencing phase. *See United States v. Pozuelos-Morales*, 526 F. App'x 74, 75 (2d Cir. 2013). "In order to prove ineffective assistance of trial counsel [at sentencing], defendant must show both that counsel's representation was unreasonable under the 'prevailing professional norms,' and that, but for counsel's incompetence, there is a reasonable probability that 'the result of the proceeding would have been different.'" *Pozuelos-Morales*, 526

F. App'x at 75 (citing *United States v. Matos,* 905 F.2d 30, 32

(2d Cir. 1990)) (denying ineffective assistance claim where

record did not support a "reasonable probability" that the

result of the sentencing hearing would have differed in

defendant's favor, but for his attorney's alleged errors);

*United States v. Herrera*, 186 F. App'x 109, 112 (2d Cir. 2006)

(same).

Pursuant to 18 U.S.C. § 3553(f) and its implementing

guideline, U.S.S.G. § 5C1.2, courts may impose lesser sentences,

providing a "safety valve" from mandatory minimum sentences in

some drug cases, if five criteria are satisfied. *United States

v. Gaskin*, 364 F.3d 438, 469 (2d Cir. 2004). One requirement is

that a defendant must, "prior to sentencing, truthfully proffer

to the government 'all information and evidence' pertaining to

his offenses and any related conduct." *Id.* (citing 18 U.S.C. §

3553(f)(5); U.S.S.G. § 5C1.2(a)(5)).

A claim that counsel gave improper advice regarding a

prisoner's safety valve hearing should also be considered under

the *Strickland* test for ineffective assistance of counsel. *See

Gaskin,* 364 F.3d at 470 (evaluating whether counsel's advice

regarding the safety valve hearing constituted ineffective

assistance of counsel); *see also Jimenez v. U.S.*, 168 F. Supp.

2d. 79, 81-82 (S.D.N.Y. 2001).

Petitioner claims that his counsel "fail[ed] to advise Petitioner to offer a truthful proffer," and "gave improper advice . . . regarding his [safety valve] proffer," and contends that he did not realize he had "nothing to gain" by providing "a version of events contradictory from McCleary's [trial testimony] at the safety valve proffer." Petitioner states that he had been found guilty, and "any protestation of innocence was inappropriate during the safety valve proffer," as "is evident in the finding of the Court of Appeals that the Petitioner's safety valve proffer was not entirely 'candid.'"[6] (Pet. at 6.) As previously noted, at the combined safety valve and sentencing hearing during which petitioner testified under oath, the court confirmed that petitioner understood the purpose of the hearing, asking: "Do you understand that it doesn't matter what you admit to, as long as you tell the truth?", to which petitioner responded, "The truth, yes, sir." (Sent. Tr. 35.) Moreover, petitioner's counsel confirmed to the court at the commencement of the proffer hearing that petitioner understood that he must "tell [] what he knows," and agreed that petitioner understood that "all that matters is telling the truth." (Sent. Tr. 2-3.)

---

[6] The court notes that petitioner's ineffective assistance of counsel and actual innocence claims are at odds with each other. Indeed, petitioner argues that his counsel's failure to advise him to testify truthfully at his safety valve hearing resulted in his (presumably untruthful) testimony in which he maintained his innocence and, consequently, his right to effective counsel was violated. Petitioner, however, also claims actual innocence as an alternate basis for relief.

Accordingly, even assuming that petitioner's attorney failed to advise him of the significance of providing complete and truthful disclosure at the safety valve hearing, petitioner would not have suffered prejudice from his attorney's purported failure, because petitioner was present when his attorney confirmed to the court that counsel advised petitioner of the importance of telling the truth, petitioner took an oath to testify truthfully, and petitioner was ultimately advised of this requirement by the court and indicated his understanding to the court. (Tr. 35.) It is unclear how petitioner would have otherwise proffered, and whether he would have changed his "untruthful" safety valve testimony or admitted guilt. Thus, petitioner is unable to show that but for counsel's alleged failure to advise him to be truthful, there is a reasonable probability that the result of the safety valve and sentencing proceeding would have been different. *Pozuelos-Morales*, 526 F. App'x at 75. Consequently, petitioner's ineffective assistance claim fails to meet the prejudice prong of the *Strickland* test.

## II. Actual Innocence

### A. Legal Standard

A claim of actual innocence "'is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits.'" *Johnson v.*

*Bellnier*, 508 F. App'x 23, 26 (2d Cir. 2013) (summary order)
(quoting *Herrera v. Collins*, 506 U.S. 390, 404 (1993)).  In
other words, a claim of actual innocence may permit federal
habeas review of a procedurally-defaulted constitutional claim.
*See id.*  Thus, a petitioner who can demonstrate actual innocence
of the convicted crime is not required to demonstrate cause or
resulting prejudice, because the actual innocence claim belongs
to a "narrow class of cases . . . implicating a fundamental
miscarriage of justice." *Schlup v. Delo*, 513 U.S. 298, 314-15
(1995) (quoting *McCleskey v. Zant*, 499 U.S. 467, 493-494
(1991)); *see Rivas v. Fischer*, 687 F.3d 514, 541 (2d Cir. 2012).
The "miscarriage of justice" exception applies only to cases
"where a constitutional violation has probably resulted in the
conviction of one who is actually innocent." *Rivas*, 687 F.3d at
540.  Indeed, "[t]he gateway should open only when a petition
presents 'evidence of innocence so strong that a court cannot
have confidence in the outcome of the trial unless the court is
also satisfied that the trial was free of nonharmless
constitutional error.'" *Qadar v. United States*, No. 13-CV-2967,
2014 WL 3921360, at *6 (E.D.N.Y. Aug. 11, 2014) (citing
*McQuiggin v. Perkins,* -- U.S. --, 133 S. Ct. 1924, 1936 (2013))
(internal citation omitted).

A petitioner's claim of actual innocence must be both
"credible" and "compelling." *Rivas*, 687 F.3d at 541.  "For the

claim to be 'credible,' it must be supported by new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." *Id.* ((citing *House*, 546 U.S. at 538) (citing *Schlup*, 513 U.S. at 324)). "For the claim to be 'compelling,' the petitioner must demonstrate that 'more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt – or to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt.'" *Id.* (quoting *House*, 547 U.S. at 538). At a minimum, a petitioner must "introduce new evidence that thoroughly undermines the evidence supporting the jury's verdict." *Id.* at 543.

When a court seeks to weigh the effect of new evidence, it must consider all new evidence, both admissible and inadmissible, in light of the pre-existing evidence in the record. *Bower v. Walsh*, 703 F. Supp. 2d 204, 221 (E.D.N.Y. 2010) (citing *Doe v. Menefee*, 391 F.3d 147, 161 (2d Cir. 2004) (internal quotation marks omitted) (noting that a court must "consider a petitioner's claim in light of the evidence in the record as a whole, including evidence that might have been inadmissible at trial" because "[a]ctual innocence requires 'not legal but factual innocence'"). Indeed, the court "must consider all the evidence, old and new, incriminating and

exculpatory and make a probabilistic determination about what reasonable, properly instructed jurors would do." *Qadar*, 2014 WL 3921360, at *7; *see House,* 547 U.S. at 538-39 ("[T]he inquiry requires the federal court to assess how reasonable jurors would react to the overall, newly supplemented record."). "If new evidence so requires, this may include consideration of the credibility of the witnesses presented at trial." *House*, 547 U.S. at 538-39. "As to new witness testimony in particular, the court considers the potential motives to be untruthful that the witness may possess, corroboration or the lack thereof, internal inconsistency, and the inferences or presumption that crediting particular testimony would require." *Lopez v. Miller*, 915 F. Supp. 2d 373, 401 (E.D.N.Y. 2013) (internal quotation marks and alteration omitted).

A petitioner must claim factual innocence, not mere legal insufficiency. *See Bousley*, 526 U.S. at 623-624. Thus the government should be "permitted to present any admissible evidence of petitioner's guilt" and is "not limited to the existing record" when rebutting the petitioner's claim on remand. *Id.* at 624. Finally, a court is free to consider "[u]nexplained delay in presenting new evidence as a factor in making its determination." *McQuiggin v. Perkins*, 133 U.S. 1924, 1927 (2013).

B. **Application**

Petitioner claims he is actually innocent and in support submits as "new evidence" an affidavit by Marlon Campbell, a federal prisoner serving a life sentence for his conviction of murder, narcotics and firearms offenses. *See United States v. Campbell*, No. 06-CR-41 (S.D.N.Y.) (McMahon). Mr. Campbell avers that McCleary confided in him while he and McCleary were incarcerated at the Metropolitan Detention Center in Brooklyn, New York. (Affidavit of Marlon Campbell ("Campbell Aff."), dated Oct. 22, 2008.) Mr. Campbell claims McCleary told him that James knew "fully well that Troy was not aware of any transactions or business between McCleary and [James]" and that McCleary "never knew [petitioner] and only because [petitioner] called him on the phone was why [petitioner] became involved in the conspiracy." (Campbell Aff. at 1.) Moreover, Mr. Campbell states that shortly after James's arrest, James "went on the run" and "could not be found," and McCleary "had no other alternative but to testify against [petitioner]." (*Id.*) Petitioner contends that this affidavit evidences that McCleary informed Campbell that McCleary "did not know the Petitioner because the Petitioner was not involved in the cocaine conspiracy," and that "he was forced to testify falsely against Petitioner because . . . James . . . was in hiding and he had to testify against someone in order to receive" a reduced sentence. (Pet. at 8.)

Although petitioner has proffered evidence not presented at trial, the affidavit from Mr. Campbell is not reliable evidence that excuses petitioner's procedural default. As an initial matter, Campbell's affidavit is dated October 22, 2008, indicating that the evidence was available to the petitioner at the time of his sentencing on August 13, 2009. (Sent Tr. 1.) In fact, petitioner told the court of the "written testimony" of Mr. Campbell at the sentencing hearing in August, and his attorney explained it further. (Sent Tr. 36.) *See Qadar*, 2014 WL 3921360, at *7 (finding "highly suspect" the fact that petitioner's affidavits were presented after conviction, despite his "ample opportunity to investigate any information that these witnesses had prior to trial" and calling his explanations for the delay "mildly plausible" to "completely feckless"). Here, petitioner does not explain why he did not present Campbell's affidavit sooner, and instead argues that because the affidavit was not available at trial, he was unable to raise the issue of new evidence on direct appeal. [7] (*See* Response to the Government's Opposition, 5-6.)

---

[7] Moreover, the government contends that petitioner should have presented his new evidence in a motion for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure, which allows a defendant to move the court for a new trial where new exculpatory evidence is discovered after trial, but that petitioner's evidence would fail to meet the threshold required for granting such a motion. Rule 33 provides that "upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "Generally, a motion for a new trial should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of

In any event, having reviewed the record as a whole, including Mr. Campbell's affidavit, the court finds petitioner's actual innocence claim neither credible nor compelling. Mr. Campbell's affidavit does not establish new evidence that is likely to call into question the credibility of the trial evidence, including McCleary's sworn testimony, that was subject to cross-examination at trial, and the corroborating telephone conversations between petitioner and McCleary. *See Florez*, 2009 WL 2228121, at *7 (finding that the petitioner's new evidence, in the form of his own testimony, was not sufficient to call into question "sworn testimony subject to cross-examination and upheld on appeal").

---

justice." *Smith v. Carpenter*, 316 F.3d 178, 183 (2d Cir. 2003). A trial court's discretion to set aside a verdict and order a new trial must be "exercised sparingly," "with great caution, and only in the most extraordinary circumstances." *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992). Thus, a district court deciding a Rule 33 motion must ask whether "it would be a manifest injustice to let the guilty verdict stand." *Id.* A "manifest injustice occurs where a trial court cannot be satisfied that competent, satisfactory and sufficient evidence" supports the jury's finding of guilt beyond a reasonable doubt, and where a real concern exists that an innocent person may have been convicted." *U.S. v. Kahale*, No. 09-CR-159, at *27 (E.D.N.Y. Sept. 27, 2010) (citing *Sanchez*, 969 F.2d at 1414) (internal quotation marks omitted).

Accordingly, even if petitioner had moved for a new trial under Rule 33 to present newly discovered evidence, his motion would likely have been denied under the high threshold required for granting a motion for a new trial. Indeed, "[a] new trial pursuant to Rule 33 based on newly discovered evidence may be granted 'only upon a showing that the evidence could not with due diligence have been discovered before or during trial, that the evidence is material, not cumulative, and that admission of the evidence would probably lead to an acquittal.'" *United States v. DiPietro*, 278 F. App'x 60, 61 (2d Cir. 2008) (citing *United States v. Alessi*, 638 F.2d 466, 479 (2d Cir. 1980)); *United States v. Owen*, 500 F.3d 83, 87 (2d Cir. 2007).

Indeed, although the sentencing court was advised of the Campbell statement and this court has considered it in the context of petitioner's habeas claim, the "new" evidence relied on by petitioner consists of hearsay statements lacking in indicia of reliability, that are neither "trustworthy eyewitness accounts" nor statements by "firsthand alibi witnesses." *Qadar*, 2014 WL 3921360, at *7 (finding new affidavits to be "unreliable hearsay statements lacking in indicia of reliability," and contrasting them with "trustworthy eyewitness accounts" or "firsthand alibi witnesses"). Campbell's claims that McCleary did not know petitioner is also contradicted by the taped telephone conversations made by McCleary on the day of petitioner's arrest, in which petitioner directed McCleary to a location where the two had previously met in connection with drug distribution. (*See* Tr. 100-02, 151-52, 155; Govt. Opp. Exs. D, E, F, Transcripts of Consensually Taped Conversations Between McCleary and Petitioner.) Moreover, as the government noted at the safety valve hearing in response to petitioner's contention that "McCleary told the prisoner that he was fabricating testimony against [petitioner] to retaliate against James for cooperating with the government," McCleary had cooperated first, leading to the arrest of petitioner and James. (Sent. Tr. 38.)

In any event, Campbell's affidavit only challenges the credibility of McCleary's statements at trial. Where the new evidence only speaks to a witness's credibility, and not to the petitioner's innocence, the evidence is insufficient to excuse a procedural default. *Donato v. United States*, No. 09-CV-5617, 2012 WL 4328368, at *3 (E.D.N.Y. Sept. 20, 2012) (rejecting actual innocence claim on grounds that witness letter would have undermined witness's credibility at trial); *see also United States v. Florez*, 447 F.3d 145, 155 (2d Cir. 2006), *cert. denied*, 549 U.S. 1040 (2006) (internal quotations marks omitted)) ("The law is well established that a federal conviction may be supported by the uncorroborated testimony of even a single accomplice witness if that testimony is not incredible on its face and is capable of establishing guilt beyond a reasonable doubt.").

Moreover, even assuming that petitioner's asserted evidence was new, credible and would have been admissible at trial, it is not sufficiently compelling to warrant a conclusion that "more likely than not, in light of the new evidence, no reasonable juror would find [petitioner] guilty beyond a reasonable doubt." *House,* 547 U.S. at 538. Indeed, the new affidavit cannot overcome the substantial evidence of petitioner's guilt adduced trial. Mr. Campbell's affidavit, though notarized pursuant to 18 U.S.C. § 4004, which authorizes

wardens and superintendents . . . [to] administer oaths . . .

[of] inmates," consist merely of statements are inconsistent

with the more reliable firsthand accounts of McCleary, that were

both corroborated by other evidence presented by the government

at trial, such as consensually recorded telephone calls and the

testimony of law enforcement witnesses, and that were subject to

cross-examination. *See Trisvan v. Ercole,* No. 07-CV-4673, 2015

WL 419685, at *10 (E.D.N.Y. Jan. 30, 2015) ("[N]ew evidence

cannot be viewed in isolation.  It must be arrayed against the

forceful evidence supporting the jury's guilty verdict.").

Petitioner does not explain why or how Mr. Campbell's testimony

would be more credible to a jury than the evidence presented at

trial.  Further, petitioner attempts to impeach McCleary's

testimony by suggesting that McCleary fabricated his testimony

against petitioner in order to obtain a more lenient sentence.

The jury, however, was made aware of McCleary's cooperation with

the government, as well as McClearly's belief that if he

cooperated and testified truthfully, the sentencing judge may be

more lenient. (*See* Tr. 44-50.)  Indeed, the jury already

considered this information when weighing McCleary's credibility

and finding defendant guilty of Counts One and Three.  Thus,

petitioner has not established that, in light of the full

record, including the new evidence, "it is more likely than not

that no reasonable jury would vote to convict him" and his claim of actual innocence must be denied.

## CONCLUSION

For the foregoing reasons, petitioner's petition for *habeas corpus* relief pursuant to 28 U.S.C. § 2255 is denied. The Clerk of the Court is respectfully requested to dismiss the petition, enter judgment in favor of respondent, and close this case. The Clerk of the Court shall serve a copy of this Memorandum and Order upon petitioner and file a declaration of service within two days of the date of this Memorandum and Order.


**SO ORDERED.**

_____/s/_____
Kiyo A. Matsumoto
United States District Judge

Dated:    November 2, 2015
          Brooklyn, New York